IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TOWNSEND VENTURES, LLC, et al.  :

    Plaintiffs,               :

v.                                              :

                                              Civil Action No. GLR-17-130

HYBRID KINETIC GROUP LIMITED,  :
et al.,

                                             :

    Defendants.

                                             :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Hybrid Kinetic Group Limited ("Hybrid Kinetic") and Billion Energy Holdings Limited's ("Billion") (collectively with Hybrid Kinetic, "HKG") Motion to Stay Proceedings and Compel Arbitration. (ECF No. 5). The Motion is fully briefed and ripe for disposition. No hearing is necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons that follow, the Court will grant the Motion.[1]

### I.    BACKGROUND[2]

**A.    The Parties**

Plaintiff Townsend Ventures, LLC ("Townsend") is a Maryland-based investment company that invests in emerging energy technologies. (Compl. ¶ 15, ECF No. 1).

---

[1] HKG also styles its Motion in the alternative as a Motion to Dismiss Claims or a Motion for a More Definite Statement of Claims. (ECF No. 5). The Court will deny these alternative Motions as moot without prejudice.

[2] Unless otherwise indicated, the Court draws the facts that follow from the Complaint (ECF No. 1) and construes them in the light most favorable to the nonmovant. To the extent the Court draws facts from beyond the pleadings, those facts are undisputed.

Townsend is the majority owner of Plaintiffs XALT Energy, LLC ("XALT Energy") and XALT Energy MI, LLC ("XALT Energy MI"). (Id. ¶ 7). XALT Energy and XALT Energy MI (collectively with XALT Energy and Townsend, "XALT"[3]) are Delaware limited liability companies "engaged in the business of the design, development, manufacture, sales, and service of advanced lithium-based energy storage systems and battery cells." (Id. ¶¶ 1, 8, 9). XALT Energy MI is a wholly owned subsidiary of XALT Energy. (Id. ¶ 9). XALT Energy and XALT Energy MI have their principal places of business in Midland, Michigan. (Id. ¶¶ 8–9).

Hybrid Kinetic is "a limited company formed in Bermuda and headquartered in Hong Kong." (Xu Decl. ¶ 2, ECF No. 5-1). Billion is a "limited company formed and based in Hong Kong." (Id. ¶ 4). Billion is a wholly owned subsidiary of Hybrid Kinetic. (Id.). HKG "is an electric vehicle manufacturer that purports to manufacture electric transit buses, electric commercial delivery vehicles, and hybrid automobiles." (Compl. ¶ 1).

**B.    The Proposed Joint Venture**

    **1.    Memorandum of Understanding**

In November 2014, the Parties executed a memorandum of understanding (the "MOU"). (Id. ¶ 28). According to the MOU, the Parties would establish a "strategic partnership" under which they would "collaborate on the development and manufacture of a Lithium Titanate Oxide (LTO) based cell and battery pack." (Id.). The MOU further

---

[3] The Court will refer to XALT and HKG collectively as the "Parties."

provides that "HKG shall utilize <u>all</u> XALT battery capacity in Midland exclusively." (Id. ¶ 30); (Pls.' Opp'n Defs.' Mot. Stay Ex. 1 ["MOU"] § 2.3, ECF No. 13-1). The MOU does not contain an arbitration provision. (See MOU).

### 2. Supply Agreement

Between March 10 and 20, 2015, the Parties negotiated a supply agreement under which "HK[G] would provide XALT with capital funding through deposits and letters of credit, and XALT would manufacture and supply battery cells to HK[G]." (Id. ¶ 39). During the negotiations, "it was contemplated that XALT would supply battery cells exclusively to HK[G], XALT's Midland manufacturing plant would run at or above full capacity (requiring additional personnel and substantial overtime), and HK[G] would purchase every battery cell manufactured at that plant." (Id.).

On or about March 20, 2015, the Parties executed an "Agreement for the Supply of Battery Cells" (the "Supply Agreement"), under which XALT formally agreed to manufacture and supply LTO battery cells to HKG. (Id. ¶ 40). The Supply Agreement memorialized HKG's earlier proposal that in addition to the $13 million it already paid XALT, HKG would pay XALT $16 million by March 31, 2015. (Id. ¶ 41).

The Supply Agreement further addressed letters of credit and purchase quantities. (Id. ¶¶ 42–43). The first letter of credit would be for approximately $95 million and HKG would provide it by May 1, 2015 to cover expenses from March 20, 2015 through the end of the calendar year. (Id. ¶ 42). Then, through calendar year 2020, HKG would provide $240

million letters of credit by January 1 to cover that calendar year's expenses. (Id.). HKG "agreed to purchase a minimum of 972,800 LTO battery cells from XALT between March 20, 2015 and December 31, 2015, and 2,560,000 LTO battery cells during each year from 2016 through 2020." (Id. ¶ 43). The Parties also "agreed that XALT's Midland plant would operate at more than 100% capacity and that HK[G] would purchase battery cells exclusively from XALT." (Id. ¶ 44).

The Supply Agreement also contains the following arbitration provision (the "Arbitration Provision"):

> Any dispute, controversy or claim arising out of or relating to this Agreement shall be submitted to the Hong Kong International Arbitration Centre for arbitration in accordance with its then effective arbitration rules. The arbitral award shall be binding and final, and any Party may apply to a court[] of competent jurisdiction for enforcement of such award.

(Xu Decl. Ex. B. ["Supply Agreement"] § 19.5).

### 3. Framework Agreement

Between April 2 and 19, 2015, the Parties attended several meetings in Los Angeles. (Compl. ¶ 45). During these meetings, the Parties negotiated the terms of a framework agreement (the "Framework Agreement") to govern HKG's buyout or purchase of XALT. (Id.).

Before the Parties finalized the Framework Agreement, HKG made several representations. HKG first stated that it had orders from a Chinese city for 1,500 buses. (Id. ¶ 46). HKG then asserted that it "had additional orders from the country of Greece for 5,000

4

buses and an agreement with China Communication Construction Company to finance 25,000 buses." (Id. ¶ 47). HKG further stated that in two days it would be announcing a capital raise of $211 million, "with $30 million to be used for the purchase of 70% of Huanghai Bus Company, $30 million to secure the initial letter of credit required under the Supply Agreement, $30 million for a financial leasing company, and $40 million to purchase an electric drivetrain company." (Id.).

On April 19, 2015, the Parties executed the Framework Agreement, under which HKG agreed to purchase XALT for $750 million. (Id. ¶¶ 48–49). Following an initial capital raise that HKG expected to occur on or around June 30, 2017, HKG would pay XALT $400 million. (Id. ¶ 49). HKG would then pay XALT $350 million after HKG went public in Hong Kong or China. (Id.). HKG contemplated that its initial public offering would occur no later than two years after the capital raise that would generate the $400 million. (Id.). The Framework Agreement, like the MOU, does not contain an arbitration provision.

## C.     The Failure of the Proposed Joint Venture

As early as May 2015, the proposed joint venture began to unravel. On or about May 21, 2015, HKG informed XALT that the first letter of credit promised under the Supply Agreement would be delayed. (Id. ¶ 52). In early June 2015, HKG stated that a draft of the letter of credit would be one month late, and a final letter of credit would be almost two months late. (Id. ¶ 53). On June 18, 2015, XALT told HKG that if HKG did not provide the first letter of credit or wire $15 million, XALT would cease all activities on behalf of HKG.

(Id. ¶ 58). Almost two weeks later, HKG wired $15 million to XALT, but HKG did not provide the letter of credit. (Id. ¶ 60). HKG made several additional representations regarding the first letter of credit, but HKG never provided the first letter or, for that matter, any of the other letters of credit due under the Supply Agreement. (Id. ¶¶ 60–61, 63, 67, 77).

During the next two months, over a series of meetings in Michigan and California, the proposed joint venture continued to disintegrate. In July 2015, HKG asserted that "the Framework Agreement was 'off the table' and would only be revisited if XALT handed over management of the company to HK[G]." (Id. ¶ 63). Then, in early August 2015, HKG communicated for the first time that the parties would need to amend the Supply Agreement to reflect lower bus volumes, revise payment terms, reduce the values of the letters of credit, and make changes to the material terms of the agreement. (Id. ¶ 64).

In late August 2015, HKG "requested that it be released from the requirement of providing a letter of credit sufficient to cover a full year's production, and asked that the letter of credit requirement be reduced to an amount sufficient to cover four months' production." (Id. ¶ 65). HKG then "demanded" other alterations to the agreements. (Id.).

In early September 2015, as the proposed joint venture was further crumbling, representatives of the Parties met at Townsend's headquarters in Hunt Valley, Maryland. (Id. ¶ 66). There, HKG informed XALT that XALT would no longer be the exclusive supplier of battery cells—HKG would split its procurement requirements between XALT and a second supplier in Europe. (Id.). XALT expressed "serious concern" about the split procurement,

but HKG ensured XALT that there would be no impact on XALT's business because the total demand for HKG's electric buses was increasing. (Id.). HKG further stated that it had acquired the Huanghai Bus Company in China. (Id. ¶ 68). HKG later admitted, however, that it did not own any bus companies. (Id.).

Approximately one week after the early-September meeting in Hunt Valley, HKG asserted that the Supply Agreement "didn't count," and HKG would require a new supply agreement. (Id. ¶ 69). In addition to other changes to Supply Agreement, HKG proposed reductions in the volume and prices of the battery cells and the value of the letters of credit. (Id.).

According to XALT, "most, if not all, of the representations" that HKG made to XALT in relation to the proposed joint venture were "false." (Id. ¶ 72). XALT asserts that HKG's alleged misrepresentations "were intended to induce XALT into believing that HK[G] had the capacity to purchase all of XALT's battery cell manufacturing capacity, as it promised in the Supply Agreement." (Id.). XALT further asserts that HKG's alleged misrepresentations "were all intended to induce XALT to tie up its manufacturing capacity entirely so that HK[G] could represent to investors that it had purchased the services of an American manufacturing plant." (Id. ¶ 73). XALT contends that HKG knew that it was "wholly unable" to meet its obligations under the Supply and Framework Agreements and "had no intent to follow through on its promises." (Id. ¶¶ 73, 76).

7

## D. Procedural History

On January 13, 2017, XALT sued HKG in this Court, raising two claims: (1) fraud and fraud in the inducement (Count I); and (2) breach of contract (Count II). (Compl.). HKG filed the present Motion on February 28, 2017. (ECF No. 5). The Motion was fully briefed as of March 27, 2017. (See ECF Nos. 13, 16).

## II. DISCUSSION

### A. Motion to Compel Arbitration

Resolving a motion to compel arbitration typically involves a two-step inquiry. See Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union, 665 F.3d 96, 101 (4th Cir. 2012). First, the Court determines "who decides whether a particular dispute is arbitrable: the arbitrator or the court." Id. Second, if the court concludes that it is the proper forum in which to adjudicate arbitrability, the Court then decides "whether the dispute is, in fact, arbitrable." Id. If the court determines at either step that the parties agreed to submit their dispute to arbitration, the next inquiry if whether the court has authority to compel arbitration. See Terra Holding GmbH v. Unitrans Int'l, Inc., 124 F.Supp.3d 745, 748–49 (E.D.Va. 2015).

#### 1. Whether the Court or the arbitrator determines if XALT's claims are arbitrable

HKG argues that the Hong Kong International Arbitration Centre ("HKIAC") must determine whether XALT's claims are arbitrable because the Arbitration Provision expressly

8

refers to the HKIAC's Rules, and those Rules provide that the HKIAC has the authority to determine whether a dispute is arbitrable. The Court agrees.

Although the United States Court of Appeals for the Fourth Circuit has "adopted a 'general policy-based, federal presumption in favor of arbitration,' that presumption is not applied 'to resolve questions of the arbitrability of arbitrability issues themselves.'" Peabody, 665 F.3d at 102 (quoting Carson v. Giant Food, Inc., 175 F.3d 325, 329 (4th Cir. 1999)). Indeed, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability." Carson, 175 F.3d at 329 (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)).

Unless the parties "clearly and unmistakably provide otherwise," the court determines arbitrability. AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986) (citing United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582–83, (1960)). The Fourth Circuit has described this "clear and unmistakable" standard as "exacting," explaining that "the presence of an expansive arbitration clause, without more, will not suffice." Peabody, 665 F.3d at 102. The Fourth Circuit has therefore concluded that "broad arbitration clauses that generally commit all interpretive disputes 'relating to' or 'arising out of' the agreement do not satisfy the clear and unmistakable test." Carson, 175 F.3d at 330.

HKG relies heavily on Terra, 124 F.Supp.3d 745. There, the United States District Court for the Eastern District of Virginia concluded that "[a]lthough the Fourth Circuit has

9

not yet said so, it appears from well-reasoned opinions in other circuits that the 'clear and unmistakable' standard is met when, in addition to the expansive language, an arbitration clause incorporates a specific set of rules that authorize arbitrators to determine arbitrability." Terra, 124 F.Supp.3d at 748. The "well-reasoned opinions" to which the Terra court cited are from the First, Second, and Ninth Circuits. See id. at n.4 (collecting cases).

The Terra court also relied on Innospec Ltd. v. Ethyl Corp., No. 3:14-CV-158-JAG, 2014 WL 5460413 (E.D.Va. Oct. 27, 2014), an earlier case in the Eastern District of Virginia. There, the district court also concluded, albeit in an unreported opinion, that "[a]lthough the Fourth Circuit has not ruled on the issue, a majority of circuit courts have held that the incorporation of specific rules that allow arbitrators to determine arbitrability meets the 'clear and convincing' standard." Innospec, 2014 WL 5460413, at *4. The court then cited opinions from the First, Second, Fifth, Eighth, Ninth, Eleventh, and Federal Circuits. See id. at n.3 (collecting cases).

In Terra, Innospec, and all the federal circuit cases cited in Terra and Innospec, the rules that the parties agreed would govern any arbitration provide that the arbitral tribunal "shall have the power to" or "may" determine arbitrability.[4] The Court discerns no difference

---

[4] Oracle Am., Inc. v. Myriad Grp. A.G., 724 F.3d 1069, 1073 (9th Cir. 2013) ("shall have the power to" determine arbitrability); Petrofac, Inc. v. DynMcDermott Petroleum Operations Co., 687 F.3d 671, 675 (5th Cir. 2012) (same); Fadal Machining Ctrs., LLC v. Compumachine, Inc., 461 F.App'x 630, 632 (9th Cir. 2011) (same); Fallo v. High-Tech Inst., 559 F.3d 874, 878 (8th Cir. 2009) (same); Qualcomm Inc. v. Nokia Corp., 466 F.3d 1366, 1373 (Fed.Cir. 2006) (same); Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship, 432 F.3d 1327, 1332 (11th Cir. 2005) (same); Contec Corp. v. Remote Sol., Co., 398 F.3d 205, 208

between rules stating that an arbitral tribunal "shall have to the power to" determine arbitrability and stating that an arbitral tribunal "may" determine arbitrability. In both instances the rules provide that the arbitral tribunal has the authority to determine arbitrability.

Here, the Arbitration Provision states that "[a]ny dispute, controversy or claim arising out of or relating to this Agreement shall be submitted to the [HKIAC] for arbitration in accordance with its then effective arbitration rules." (Supply Agreement § 19.5). HKG presents a copy of HKIAC's Rules. (See Defs.' Mot. to Compel Ex. 2 ["HKIAC Rules"], ECF No. 5-2). Article 19.1 of the HKIAC Rules provides that "[t]he arbitral tribunal may rule on its own jurisdiction under these Rules, including any objections with respect to the existence, validity or scope of the arbitration agreement[s]." (Emphasis added.) Like the arbitration rules in Terra, Innospec, and all the federal circuit court cases cited in Terra and Innsopec, the arbitration rules in this case provide that the arbitral tribunal has the authority to determine arbitrability.

Thus, the Court concludes that the "clear and unmistakable" standard is met. The Parties clearly and unmistakably committed the determination of arbitrability to the HKIAC. The Court, therefore, need not address the second step in the two-step inquiry: whether XALT's claims are arbitrable.

---

(2d Cir. 2005) (same); Apollo Computer, Inc. v. Berg, 886 F.2d 469, 473 (1st Cir. 1989) ("may" determine arbitrability); Terra, 124 F.Supp.3d at 748 ("shall have the power to" determine arbitrability); Innospec Ltd. v. Ethyl Corp., 2014 WL 5460413, at *3 (same).

## 2. Whether the Court has the authority to compel arbitration

When one of the parties to an arbitration agreement is not a United States citizen, an order to arbitrate must be based on the Convention on Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"). See In re White Mountain Mining Co., L.L.C., 403 F.3d 164, 168 (4th Cir. 2005); see also 9 U.S.C. § 202 (2012). Chapter Two of the Federal Arbitration Act ("FAA") implements the Convention. See 9 U.S.C. § 201 (2012). The Court concludes, therefore, that because Hybrid Kinetic and Billion are foreign entities, Chapter Two of the FAA provides authority for this Court to compel arbitration in the HKIAC. See 9 U.S.C. § 206 (2012).

Before compelling arbitration, however, the Court must also examine the four jurisdictional requirements the Fourth Circuit outlined in Aggarao v. MOL Ship Mgmt. Co., 675 F.3d 355 (4th Cir. 2012). See Terra, 124 F.Supp.3d at 749. These factors are whether:

> (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

Aggarao, 675 F.3d at 366 (quoting Balen v. Holland Am. Line Inc., 583 F.3d 647, 654–55 (9th Cir. 2009)). When all of these requirements are satisfied, "a district court is obliged to order arbitration unless it finds that the [arbitration] agreement is null and void, inoperative

or incapable of being performed." Id. at 366–67 (citation and internal quotation marks omitted).

The Court concludes that all of the Aggarao requirements are satisfied. First, the Supply Agreement is a written agreement under which the Parties agreed to arbitrate in accordance with the Arbitration Provision. (See Supply Agreement § 19.5). Second, the Arbitration Provision states that arbitration will occur in the HKIAC, and the People's Republic of China is a signatory to the Convention. See Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Dec. 29, 1970, 21 U.S.T. 2517 (China).[5] Third, the Supply Agreement is undeniably commercial in nature, as it governs the supply of battery cells for electric vehicles. Fourth, Billion, who signed the Supply Agreement, is a foreign entity. (Supply Agreement at 9); (Xu Decl. ¶ 4). Additionally, XALT does not argue that the Court should conclude that the Supply Agreement is null and void, inoperative, or incapable of being performed. Accordingly, because Chapter Two of the FAA provides this Court with authority to compel arbitration and because all four of the Aggarao requirements are satisfied, the Court will compel arbitration.[6]

---

[5] The Convention also applies to Hong Kong, a Special Administrative Region of China. Status Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 1958), U.N. Comm'n on Int'l Trade L., http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/NYConvention_status.html (last visited Aug. 29, 2017).

[6] To the extent that HKG moves in the alternative to dismiss XALT's claims or for a more definite statement of XALT's claims, the Court will deny those alternative Motions as

## III. CONCLUSION

For the foregoing reasons, the Court will GRANT HKG's Motion to Stay Proceedings and Compel Arbitration (ECF No. 5), COMPEL arbitration before the HKIAC, and STAY this matter pending the outcome of the arbitration. A separate Order follows.

Entered this 30th day of August, 2017

/s/
_____
George L. Russell, III
United States District Judge

---

moot without prejudice.